**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: | Case No. 1:16-cv-5140 |
| GENERAL MOTORS LLC IGNITION SWITCH LITIGATION | MDL No. 14-MD-2543 (JMF) |
| | **COMPLAINT FOR DAMAGES** |
| *This Document Relates To* | **JURY TRIAL DEMANDED** |
| MARGIE BEAN, MERTON BEAN and NICHOLAS OSBORN, | |
| PLAINTIFFS, | |
| v. | |
| GENERAL MOTORS, LLC and GARY GRUNER MOTOR CO., | |
| DEFENDANTS. | |

1309683.1

<u>**PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs MARGIE BEAN, MERTON BEAN and NICHOLAS OSBORN ("Plaintiffs")
hereby come before this Honorable Court and files this Complaint for Damages and Demand for
a Jury Trial, respectfully showing the following:

## I.    <u>INTRODUCTION</u>

1.    This case involves personal injuries arising from Defendant General Motors,
LLC's ("New GM") egregious and ongoing failure to disclose, and the affirmative concealment
of, a known safety defect in certain General Motors ("GM") vehicles, in which the vehicle's
ignition switch inadvertently moves from the "run" position to the "accessory" or "off" position
during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and
braking, as well as a failure of the vehicle's airbags to deploy (the "Ignition Switch Defect").
Plaintiff brings this Complaint against New GM as the sole Defendant, and asserts claims for
relief based on New GM's liability based on its knowledge, conduct, and breach of its duties
toward the purchasers of GM vehicles, as well as its duties as successor of Old GM. This
Complaint seeks recovery of damages arising from New GM's breaches of its independent, non-
derivative duties toward Plaintiff. This Complaint also asserts claims against New GM for
liability as a successor and mere continuation of the pre-2009 bankruptcy General Motors
Corporation ("Old GM").

2.    Plaintiff hereby asserts claims against New GM for personal injuries from an
automobile crash that occurred after GM's July 10, 2009 bankruptcy sale and restructuring.

3.    This Complaint sets forth those facts relating to Old and New GM's
unprecedented abnegation of basic standards of safety, truthfulness, and accountability, to the
detriment of millions of consumers and the public at large, and specifically, Plaintiff. It draws

upon an array of sources, including documents GM produced to the National Highway Traffic Safety Administration ("NHTSA"), the House Energy & Commerce Committee, and the results of an internal investigation overseen by Anton R. Valukas ("Valukas Report").

## II.    PARTIES

4.      Plaintiff Margie Bean is an adult citizen and resident of the State of Oregon. Plaintiff Margie Bean was the driver of a 2003 Chevrolet Monte Carlo, VIN 2G1WX15K539400547, (the "Subject Vehicle") that was involved in a motor vehicle accident on or about July 4, 2014, (the "Subject Incident") in which she was seriously injured and rendered paraplegic. The Subject Incident and the Plaintiff's injuries were proximately caused by the Ignition Switch Defect.

5.      Plaintiff Merton Bean is an adult citizen and resident of the State of Oregon. Plaintiff Merton Bean is the lawful husband of Margie Bean and therefore hereby asserts a loss of consortium claim arising from his wife's injuries sustained in the motor vehicle accident on or about July 4, 2014, (the "Subject Incident") in which she was seriously injured and rendered paraplegic. The Subject Incident and the Plaintiff's injuries were proximately caused by the Ignition Switch Defect.

6.      Plaintiff Nicholas Osborn, is minor and resident of the State of Oregon.  He brings this suit by and through his guardian and representative, Merton Bean.  Plaintiff Nicholas Osborn was the rear seat passenger (in a booster seat and belted) of the 2003 Chevrolet Monte Carlo, VIN 2G1WX15K539400547, (the "Subject Vehicle") that was involved in a motor vehicle accident on or about July 4, 2014, (the "Subject Incident") in which he was injured. The Subject Incident and the Plaintiff's injuries were proximately caused by the Ignition Switch Defect.

7.      New GM is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit,

Michigan.  The sole member and owner of New GM is General Motors Holdings LLC.  General

Motors Holdings LLC is a Delaware limited liability company with its principal place of

business in the State of Michigan.  The sole member and owner of General Motors Holdings

LLC is General Motors Company.  General Motors Company is a Delaware Corporation, which

has its principal place of business in the State of Michigan, and is a citizen of the States of

Delaware and Michigan.

8.      In 2009, Old GM filed for bankruptcy, and sold substantially all of its assets

pursuant to a Master Sales and Purchase Agreement ("Agreement") to New GM.  New GM was

incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and

assumed certain liabilities of Old GM through a Section 363 sale under Chapter 11 of the U.S.

Bankruptcy Code.

9.      As part of the bankruptcy Master Sale and Purchase Agreement, New GM

expressly assumed various liabilities for deaths and personal injuries arising from Old GM

vehicles, including:

> [A]ll Liabilities to third parties for death, personal injury, or
> other injury to Persons or damage to property caused by motor
> vehicles designed for operation on public roadways or by the
> component parts of such motor vehicles and, in each case,
> manufactured, sold or delivered by Seller [Old GM]
> (collectively, "Product Liabilities"), which arise directly out of
> accidents, incidents or other distinct and discreet occurrences
> that happen on or after the Closing Date and arise from such
> motor vehicles' operation or performance (for avoidance of
> doubt, Purchaser [New GM] shall not assume, or become liable
> to pay, perform or discharge, any Liability arising or contended
> to arise by reason of exposure to materials utilized in the
> assembly or fabrication of motor vehicles manufactured by
> Seller [Old GM] and delivered prior to the Closing Date,
> including asbestos, silicates or fluids, regardless of when such
> alleged exposure occurs);

10.     New GM also expressly assumed:

> [A]ll Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

11.    Furthermore, New GM expressly assumed the obligation to comply with federal and state certification, reporting, and recall requirements:

> From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

12.    Finally, New GM also expressly assumed "all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the closing." Those assets included all contracts of Old GM, including its contracts with dealers and service centers.

13.    Defendant GARY GRUNER MOTOR CO. ("GRUNER") is corporation doing business as Gary Gruner Chevrolet Buick GMC. GRUNER sold the Subject Vehicle to Plaintiffs.

## III.    <u>JURISDICTION AND VENUE</u>

14.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy for this action exceeds $75,000, and Plaintiff is a citizen of a different state than Defendant New GM.

1309683.1

15.     This Court has personal jurisdiction over New GM because it conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

16.     Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, New GM transacts business within this District, and some of the events establishing the claims arose in this District.

17.     Pursuant to this Court's direction that new plaintiffs can file directly in the MDL without first filing in the district in which they reside, Plaintiff is filing this action as if it had been filed in the judicial district in which she resides.

## IV.    STATEMENT OF FACTS

### A.    Background

18.     An auto manufacturer should never make profits more important than safety, and should never conceal defects that exist in its vehicles from customers or the public.  New GM Vehicle Safety Chief Jeff Boyer acknowledged that: "Nothing is more important than the safety of our customers in the vehicles they drive."

19.     The first priority of a car manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power steering, power brakes, seatbelt pretensioners, and other safety features that can prevent or minimize the threat of death or serious bodily harm to the vehicle's occupants.

20.     The Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), its accompanying regulations, and state statutory and common law require prompt disclosure of serious safety defects known to a manufacturer.  If it is determined that the

vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.

21.     Millions of vehicles designed, manufactured, and sold by Old GM and New GM have a safety defect such that the vehicle's ignition switch inadvertently moves from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy (the "Ignition Switch Defect"). These vehicles are referred to in this Complaint as "Defective Vehicles."

22.     The Defective Vehicles contain substantially similar ignition switches and cylinders, with the key position of the lock module located low on the steering column, in close proximity to a driver's knee. The ignition switch systems on these vehicles are prone to fail during ordinary and foreseeable driving situations.

23.     Specifically, the ignition switches can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Vehicles. The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons. When the ignition switch fails, the vehicle may suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

24.     The ignition switch systems at issue are defective in at least three major respects. First, the switches are weak; due to a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position. Second, because the ignition

switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.  Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

25.     Because of defects in their design, the Ignition Switches installed in the Defective Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions.  The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position.

26.     The ignition switch at issue is a simple and inexpensive part, as can be seen in the photographs and measurements from McSwain Engineering, Inc., below:



The top component is the switch detent plunger of a 2005 Chevrolet Cobalt, which is one of the seven GM models that have been recalled over problems with the vehicles' ignition switches. The bottom image is the same component in new service replacement part. It's longer in order to produce more tension. The weak tension of the shorter spring is believed to be the reason why ignition keys in the cars would easily switch from the on position to the accessory position if jostled. Courtesy of McSwain Engineering

27.     Vehicles with defective ignition switches are therefore unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

28.     Indeed, New GM itself has acknowledged that the defective ignition switches pose an increased risk of injury or fatality, and the compensation fund established by New GM and Kenneth Feinberg to settle personal injury and wrongful death claims has already linked at least 124 deaths and 275 personal injuries to the Ignition Switch Defect.  The Center for Auto Safety studied collisions in just two vehicle makes, and linked the defect to over 300 accidents. There is every reason to believe that as more information is made public, these numbers will continue to grow.

29.     Alarmingly, Old GM knew of the deadly Ignition Switch Defect and its dangerous consequences from at least 2001, but concealed its knowledge from consumers and regulators.  New GM did the same, and, incredibly, it was not until 2014 – more than a decade later – that the ignition switch recalls were first announced.

30.     In February and March of 2014, New GM, which has assumed the liabilities of Old GM for the conduct at issue in this Complaint, and which has independent and non-derivative duties of candor and care based upon its own knowledge and conduct, issued its first set of recalls of various models due to the defective ignition switch.  The recalls encompassed 2.19 million vehicles in the United States and included the following models of cars manufactured by Old GM: 2005-2009 Chevrolet Cobalts; 2006-2009 Pontiac G5s; 2006-2009 Chevrolet HHRs and Pontiac Solstices; 2005-2009 Pontiac Pursuits; 2003-2007 Saturn Ions; and 2007-2009 Saturn Skys.

1309683.1

31.    On June 23, 2014, New GM notified NHTSA and consumers that it was issuing a second recall for Defective Vehicles (the "June recall").  Here, New GM recalled 3.14 million vehicles.  New GM characterized the June recall as relating to the design of the ignition key with a slot (rather than a hole), which allows the key and the key fob to hang lower down in the vehicle where it is vulnerable to being hit by the driver's knee.  Despite this delineation, this "key slot defect" is substantially identical to the ignition switch defect that gave rise to the earlier recall and creates the same safety risks and dangers.

32.    According to documents on NHTSA's website, 2,349,095 of the vehicles subject to the June recall were made by Old GM.  792,636 vehicles were made and sold by New GM. The Defective Vehicles made by Old GM with the ignition key slot defect include: 2005-2009 Buick Lacrosses; 2006-2009 Buick Lucernes; 2004-2005 Buick Regal LS & GS; 2000-2005 Cadillac Devilles; 2007-2009 Cadillac DTSs; 2006-2009 Chevrolet Impalas; and 2006-2007 Chevrolet Monte Carlos.

33.    Like the ignition switch defect that is the subject of the February/March recall, the ignition key slot defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to "off" or "accessory" position.  This, in turn, may result in a loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increase the risk of a crash. Moreover, as with the ignition switch defect, because of this defect, if a crash occurs, the airbags are unlikely to deploy.

34.    New GM has tried to characterize the recall of these 3.14 million vehicles as being different than the ignition switch defect in the February/March recall when in reality it is for exactly the same defect, posing the same safety risks.  New GM has attempted to distinguish

the ignition key slot defect from the ignition switch defect to provide it with cover and an explanation for why it did not recall these 3.14 million vehicles much earlier, and allow New GM to provide a more limited, cheap and ineffective "fix" in the form of a key with hole (as opposed to a slot).

35.    On July 2, 2014 and July 3, 2014, New GM announced it was recalling 7.29 million Defective Vehicles due to "unintended key rotation" (the "July recall").  The vehicles with the unintended key rotation defect were built on the same platform and with defective ignition switches, likely due to weak detent plungers just like the other Defective Vehicles.  The Old GM vehicles implicated in the July recall are: 2000-2005 Chevrolet Impalas and Monte Carlos; 1997-2005 Chevrolet Malibus; 1999-2004 Oldsmobile Aleros; 1999-2005 Pontiac Grand Ams and 2000-2004 Pontiac Grand Prixs; certain 2003-2008 Cadillac CTSs; and certain 2004-2006 Cadillac SRX vehicles.

36.    As with the vehicles subject to the June recall, New GM has downplayed the severity of the "unintended key rotation" defect, and its recall offers a similarly cheap and ineffective "fix" in the form of new keys.  New GM is not upgrading the ignition switches in these vehicles, altering the placement of the ignition so that it is not placed low on the steering column and is not correcting the algorithm that immediately disables the airbags as soon as the Defective Vehicle's ignition switch leaves the "run" position.

37.    On September 9, 2014, New GM announced it was recalling nearly 47,000 vehicles for unintended ignition key rotation due to the driver's knee unintentionally knocking the key out of the run position, turning off the engine, and affecting power steering, power braking and airbag deployment.  The recalled vehicles include the 2011-2013 Chevrolet Caprice and 2008-2009 Pontiac G8s.  New GM is not replacing the ignition switches in these vehicles,

opting instead for the cheaper "fix" of replacing the key blade and advising drivers adjust their seat and steering column to allow greater clearance between their knee and the ignition key.

38.    Collectively, these four groups of recalls all relate to defects in the ignition switch system that New GM could and should have remedied years ago.  The vehicles in all of these recalls are the "Defective Vehicles."

39.    From at least 2005 to the present, both Old GM and New GM received reports of crashes and injuries that put Old GM and New GM on notice of the serious safety issues presented by its ignition switch system.  Given the continuity of engineers, general counsel, and other key personnel from Old GM to New GM, to say nothing of the access to Old GM's documents, New GM was aware of the ignition switch defects from the very date of its inception pursuant to the July 5, 2009 bankruptcy Sale Order, which became effective on July 11, 2009.

40.    Despite the dangerous, life-threatening nature of the ignition switch defects, including how the defects affect critical safety systems, New GM concealed the existence of the defects and failed to remedy the problem.

41.    The systematic concealment of known defects was deliberate, as both Old and New GM followed a consistent pattern of endless "investigation" and delay each time they became aware (or aware yet again) of a given defect.  In fact, recently revealed documents show that both Old and New GM valued cost-cutting over safety, trained their personnel to never use the word "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

1309683.1

42.     According to the administrator of NHTSA, Old and New GM worked to hide documents from the government regulator and to keep people within the companies from "connecting the dots" to keep information secret.

43.     New GM's CEO, Mary Barra, has admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened." But that admission, and New GM's attempt to foist the blame on its parts supplier and engineers, lawyers and others whom it has now terminated, are cold comfort for Plaintiff and consumers.

44.     But there is more.  In 2014, New GM announced at least 84 recalls for more than 70 separate defects affecting over 27 million GM-branded vehicles sold in the United States from model years 1997-2015.  In 2015, New GM announced five more significant recalls for separate safety-related defects affecting over 129,000 GM-branded vehicles sold in the United States from model years 2004-2015.  The unprecedented scope of these recalls has completely belied the companies' claims that they made reliable and safe cars.  From its very inception, New GM had the knowledge, the choice, the opportunity, and the responsibility to prevent personal and economic harm by timely and properly recalling the Defective Vehicles and timely and properly correcting the other safety defects.  The serious injuries that Plaintiff and other GM customers suffered could have been prevented if GM had timely disclosed the defects in its vehicles and abided by its duties to consumers.  This Complaint seeks the redress now available for New GM's failure to do so.

45.     GM has so far acknowledged through Ken Feinberg that the Ignition Switch Defect has caused at least 124 deaths.  GM has refused, however, to disclose the identities of those it counts among these 124 deaths.  Independent safety regulators have recorded at least 303

deaths associated with only the Saturn Ion and Chevrolet Cobalt models discussed above.  The actual number of deaths for all Defective Vehicles is expected to be much higher.

46.     On September 16, 2015, New GM and the Department of Justice entered into a Deferred Prosecution Agreement ("DPA").  In that agreement, New GM admitted that it failed to disclose to NHTSA and the public that a potentially lethal safety defect caused airbag non-deployment in certain GM vehicles. New GM also admitted that it affirmatively misled consumers about the safety of GM cars afflicted by the Ignition Switch Defect.  Furthermore, New GM admitted that the Ignition Switch Defect was responsible for at least 15 deaths, and several serious injuries, many of which occurred nearly a decade before New GM recalled the Defective Vehicles.

47.     Per New GM's admissions in the DPA, GM personnel knew by at least the spring of 2012 that the Ignition Switch Defect presented a safety defect because it could cause airbag non-deployment associated with death and serious injury.  GM had knowingly manufactured vehicles with the Ignition Switch Defect for over a decade at that point.

48.     The Ignition Switch Defect precludes drivers and owners of the Defective Vehicles, such as Plaintiff, from proper and safe use of their vehicles.  This defect reduces vehicle occupant protection, and endangers everyone in the Defective Vehicles and on the roads.

49.     No driver or owner of the Defective Vehicles, including Plaintiff, knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

50.     Prior to the sale of the Defective Vehicles, Old GM and New GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to Old GM,

1309683.1

collected by the National Highway Transportation Safety Administration's Office of Defect

Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field

testing done in response to those complaints; aggregate data from GM dealers; and accident data.

Despite this knowledge, Old GM and New GM failed to disclose and actively concealed the

Ignition Switch Defect from Plaintiff and the public, and continued to market and advertise the

Defective Vehicles as reliable and safe vehicles, which they are not.

51.     As a result of New GM's alleged misconduct, Plaintiff was harmed and suffered

actual damages and personal injuries.  The Defective Vehicles are unsafe, unfit for their ordinary

and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition

Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk

of injury or death.  Drivers and owners of the Defective Vehicles, including Plaintiff, did not

receive the benefit of their bargain as purchasers and/or lessees, received vehicles that were of a

lesser standard, grade, and quality than represented, and did not receive vehicles that met

ordinary and reasonable consumer expectations.  Drivers and owners of the Defective Vehicles,

including Plaintiff, did not receive vehicles that would reliably operate with reasonable safety,

and that would not place drivers and occupants in danger of encountering an ongoing and

undisclosed risk of harm, which could have been avoided, as New GM knew but did not

disclose, through the use of non-defective ignition parts.

      **B.**     **The Defective Vehicles and New GM's Successor Liability**

52.     As used in this Complaint, the "Defective Vehicles" refers to the Old GM and

New GM vehicles sold in the United States equipped at the time of sale with ignition switches

sharing a common, uniform, and defective design, including the following makes and model

years:

- Buick Lacrosse — 2005-2009

- Buick Lucerne — 2006-2011

- Buick Regal LS & GS — 2004-2005

- Cadillac Deville — 2000-2005

- Cadillac CTS — 2003-2014

- Cadillac DTS — 2004-2011

- Cadillac SRX — 2004-2006

- Camaro — 2010-2014

- Chevrolet Cobalt — 2005-2010

- Chevrolet HHR — 2006-2011

- Chevrolet Impala — 2000-2014

- Chevrolet Malibu — 1997-2005

- Chevy Monte Carlo — 2000-2008

- Daewoo G2X — 2007-2009

- Oldsmobile Alero — 1999-2004

- Oldsmobile Intrigue — 1998-2002

- Opel/Vauxhall GT — 2007-2010

- Pontiac G4 —2005-2006

- Pontiac G5 — 2007-2010

- Pontiac Grand Am — 1999-2005

- Pontiac Grand Prix — 2004-2008

- Pontiac Pursuit — 2005-2006

- Pontiac Solstice — 2006-2010

- Saturn Ion — 2003-2007

- 15 -

- Saturn Sky — 2007-2010

53.    Plaintiff's Subject Vehicle, a 2004 Cadillac CTS, is among the Defective

Vehicles listed above.

54.    General Motors Corporation was founded on September 16, 1908, in Flint,

Michigan, and was incorporated on October 13, 1916, in Delaware.  On June 1, 2009, General

Motors Corporation ("Old GM") filed a Chapter 11 bankruptcy petition in the United States

Bankruptcy Court for the Southern District of New York.[1]  On July 5, 2009, that court approved

the sale of substantially all of the assets of Old GM to an entity known as General Motors LLC

("New GM").[2]  Old GM sold all of its assets to New GM in a transaction finalized on July 10,

2009.[3]  In that sale, all Old GM brands, inventory, physical assets, management, personnel,

vehicles and general business operations were transferred to New GM.  New GM acquired the

contracts, books, and records of Old GM.  New GM acquired all goodwill and intellectual

property of Old GM.  At no time was the business enterprise of the General Motors Company

interrupted, and the New GM brand was continued as the same brand as Old GM.[4]  New GM is

the mere continuation or reincarnation of the same business enterprise as Old GM.

55.    New GM acquired all or substantially all of the manufacturing assets of Old

GM, and undertook the identical manufacturing operation as Old GM.  New GM continued the

manufacture, marketing, sale, and warranty of the Old GM brands, including the Chevrolet

Cobalt, the Chevrolet HHR, the Buick Allure, the Buick LaCrosse, the Buick Lucerne, the

Cadillac Deville, the Cadillac DTS, the Cadillac CTS, the Cadillac SRX, the Chevrolet Impala,

the Chevrolet Camaro, the Chevrolet Malibu, and the Chevrolet Monte Carlo.

---

[1] Valukas Report at 1, FN 1 and Valukas Report at 131.
[2] *Id.*
[3] Valukas Report at 131-132.
[4] Valukas Report at 132, FN 577.

56.     Old GM and New GM promoted these and other Defective Vehicles as safe and reliable in numerous marketing and advertising materials.

57.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease.

### C.     The Subject Incident

58.     Plaintiff hereby incorporates by reference each and every paragraph set forth in this complaint as if fully copied and set forth at length herein.

59.     At around 12:30 p.m. on July 4, 2014, Plaintiff Margie Bean was driving the Subject Vehicle northbound on Highway 97 near the intersection of Jericho Lane in Jefferson County, Oregon.

60.     While driving at a safe speed, Plaintiff suddenly lost control of the Subject Vehicle, and was unable to steer it properly.  The Subject Vehicle veered off the road, into a grassy area, into a culvert, and eventually came to rest after striking a willow tree.

61.     To Plaintiff's knowledge and understanding, the Subject Vehicle had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed, and sold by GM, and, other than an intermittent "check engine" light issue, Plaintiff was unaware of any problems or concerns with the Subject Vehicle or its components prior to the incident described herein.

62.     The Subject Vehicle's loss of vehicular control, sudden unintended shutdown, loss of power steering, loss of power brakes, and/or the non-deployment of airbags upon impact during the Subject Incident, among other failures, was caused by the Ignition Switch Defect.

63.     The Ignition Switch Defect caused Plaintiff to suffer significant injuries that could have been mitigated or avoided altogether if the Defective Ignition Switch in the Subject Vehicle had not failed.

**V.     OLD GM AND NEW GM FRAUDULENTLY CONCEALED THE DEFECT IN THEIR VEHICLES, THEREBY TOLLING ALL APPLICABLE STATUTES OF LIMITATIONS**

64.     All applicable statutes of limitation have been tolled by Old and New GM's knowing, ongoing and active fraudulent concealment and denial of the facts alleged herein. Plaintiff did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old and New GM did not report information within their knowledge to federal authorities (including NHTSA), their dealerships, or consumers.  Nor would a reasonable and diligent investigation have disclosed that Old or New GM had information in their possession about the existence and dangerousness of the defects, or that each opted to conceal that information until shortly before this action was filed.

65.     All applicable statutes of limitation also have been tolled by operation of the discovery rule.  Specifically, Plaintiff could not have discovered, through the exercise of reasonable diligence, that the Subject Vehicle was defective within the time period of any applicable statutes of limitation.

66.     Instead of disclosing the myriad safety defects and disregard of safety of which it was aware, New GM falsely represented that its vehicles were safe, reliable, and of high quality, and that it was a reputable manufacturer that stood behind GM-branded vehicles after they were sold.

67.     New GM has been, since its inception, under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Defective Vehicles, including the Subject Vehicle.  Instead, New GM has consistently, knowingly, affirmatively, and actively concealed

the true nature, quality, and character of the Defective Vehicles from consumers, including

Plaintiff.

68.    Based on the foregoing, New GM is estopped from relying on any statutes of

limitations in defense of this action as to claims.

69.    Overall, regardless of whether it was New GM or Old GM that manufactured

or sold a particular Defective Vehicle, New GM is responsible for *its own* actions with respect to

*all* the Defective Vehicles, and the resulting harm to Plaintiff that occurred as the result of GM's

acts and omissions.  Simply put, GM was aware of serious safety defects, and it also knew that

Defective Vehicle owners were unaware of the defect, and it chose both to conceal these defects,

and to forgo or delay any action to correct them.  Under these circumstances, New GM had the

clear duty to disclose and not conceal the ignition switch defects to Plaintiff and consumers—

regardless of when they acquired the Defective Vehicles.

70.    New GM's obligations stem from several different sources, including, but not

limited to: (i) the obligations it explicitly assumed under the TREAD Act to promptly report any

safety defect to Defective Vehicle owners and to NHTSA so that appropriate remedial action

could occur; (ii) the duty it had under the law of fraudulent concealment; (iii) the duty it had

under State consumer protection and other laws; and (iv) the general legal principle embodied in

§ 324A of the Restatement (Second) of Torts, ("Liability To Third Person For Negligent

Performance Of Undertaking").

71.    In acquiring Old GM, New GM expressly assumed the obligations to make all

required disclosures under the TREAD Act with respect to all the Defective Vehicles.

72.     Under the TREAD Act, if it is determined that vehicle has a safety defect, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect, and may be ordered to remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

73.     Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

74.     The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

75.     It cannot be disputed that New GM assumed a duty to all Defective Vehicle owners under the TREAD Act, and that it violated this duty.

76.     Under § 324A of the Restatement (Second) of Torts, an entity that undertakes to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability for harm to the third person resulting from the failure

to exercise reasonable care to protect the undertaking if the "failure to establish reasonable care increases the risk of such harm . . . ."

77.    Restatement § 324A applies to an undertaking which is purely gratuitous, and it applies with even greater force here, where New GM is receiving substantial remuneration for its undertaking in relation to its dealerships' service centers.  New GM provides parts for the Defective Vehicles as they are serviced at its dealerships, and receives substantial revenue from dealerships relating to the servicing of Defective Vehicles.  It also receives an additional benefit in that many of the people who own these vehicles will eventually sell or trade in their old vehicles for new ones.  Consumers using New GM service centers and buying New GM replacement parts necessarily rely upon New GM to advise its dealerships of defects, notify its dealerships of safety related issues, provide its dealerships with accurate and up to date information and enable them to remedy defects.  New GM's failure to carry out these obligations has increased the risk of harm to owners of Defective Vehicles, who regularly have their vehicles inspected and serviced at New GM dealerships and rely upon representations that the vehicles are safe and free of defects.

78.    New GM's dealerships pass along GM replacement parts, and they also rely on New GM's expertise regarding how the vehicles should be maintained, and what conditions are necessary for the dealer to conclude that the vehicles are in proper working order at the time they are inspected, serviced, and released back to the owner.  The dealerships rely on New GM's assurances of safety, that New GM will tell them about safety related problems that come to New GM's attention, and that New GM will pass along knowledge of defects and how to address them.  Dealers servicing the Defective Vehicles rely on New GM's representations that the vehicles and their component parts and safety features will function correctly if certain

conditions are met when the vehicles are inspected and serviced, as do the consumers who go to a New GM dealership for repairs. New GM's breach of its obligations to its dealerships has resulted in harm to Plaintiff and other consumers.

## VI.    CLAIMS FOR RELIEF

### A.    STRICT LIABILITY

79.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

80.    Old GM and New GM designed, manufactured, and/or sold the Defective Vehicles, including the Subject Vehicle, with unreasonably dangerous design, manufacturing, and/or marketing defects, as set forth herein, within the meaning of Mo. Rev. Stat. § 537.760.

81.    *Design Defect* – Old GM and New GM designed, manufactured, and/or sold the Subject Vehicle, with one or more design defects, more particularly set forth in the preceding paragraphs in this Complaint, including but not limited to an Ignition Switch Defect that led to loss of power steering and power braking and prevented the vehicle's airbag from deploying in the event of an impact. This product design was not reasonably safe, and safer alternative designs existed at the time of production of the Subject Vehicle that would have prevented or significantly reduced the above risks without substantially impairing the vehicle's utility. These safer alternative designs were economically and technologically feasible, by the application of existing or reasonably achievable scientific knowledge, at the time that the Subject Vehicle left control of Old GM, and by extension, New GM.

82.    *Manufacturing Defect* – Old GM and New GM designed, manufactured, and/or sold the Subject Vehicle, with one or more manufacturing defects, more particularly set forth above. The Subject Vehicle manufactured by Old GM and New GM deviates, in its construction

- 22 -

or quality, from the specifications or planned output in a manner that renders the automobiles unreasonably dangerous.

83.    *Marketing Defect and Failure to Warn* – Old GM and New GM designed, manufactured, and/or sold the Subject Vehicle with one or more marketing defects:

    a.    There was an unreasonable risk in the intended or reasonably foreseeable use of such automobile in that the above defect prevents the vehicle's airbag from being deployed, among other dangerous conditions, causing physical injury and death;

    b.    Old GM and New GM knew, foresaw, or should have known and foreseen the above risk;

    c.    Old GM and New GM failed to adequately warn Plaintiffs of the above risks, failed to adequately instruct Plaintiffs how to avoid the above danger, or both.

84.    *Unreasonably Dangerous* – The manufacturing defects, marketing defects, or both, rendered the Subject Vehicle unreasonably dangerous within the meaning of Section 402A of the Restatement (Second) of Torts, by making the automobile dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

85.    The design, manufacturing, and/or marketing defects, or any of them, rendered the Subject Vehicle unreasonably dangerous within the meaning of Section 402A of the Restatement (Second) of Torts.

86.    The design, manufacturing, and/or marketing defects, or any of them, were producing causes of Plaintiffs' injuries and damages, as more particularly set forth above.

87.    It was entirely foreseeable to, and well-known by, Old GM and New GM that incidents involving its automobiles, such as occurred herein, would on occasion take place during the normal and ordinary use of said automobiles.

88.    The Subject Vehicle was defective and unreasonably dangerous within the meaning of Section 402A of the Restatement (Second) of Torts in that it contained the Ignition Switch Defect that posed several safety hazards, including, but not limited to, the prevention of the vehicle's airbag from deploying upon an impact.

89.    The Subject Vehicle was in this defective condition at the time it left the possession or control of Old GM and New GM.

90.    The Subject Vehicle reached Plaintiffs without substantial change to the condition of the Ignition Switch.

91.    Old GM and New GM designed, manufactured, marketed, distributed, and sold the Subject Vehicle to be unreasonably dangerous and defective within the meaning of Section 402A Restatement (Second) Torts in that the Subject Vehicle was unreasonably dangerous as designed, marketed, manufactured, or any of them.  The Subject Vehicles contained an Ignition Switch that was defective, inferior and inadequately designed, marketed and manufactured.

92.    The foregoing acts and/or omissions of Old GM and New GM were a producing and/or proximate cause of the Plaintiffs' damages.

**B.    NEGLIGENCE**

93.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

94.    Old GM and New GM were negligent in designing, manufacturing, and/or selling the Subject Vehicle, with one or more design defects, more particularly set forth above,

- 24 -

including the Ignition Switch Defect that prevented the vehicle's airbag from deploying in the event of an impact.

95.     Old GM and New GM owed Plaintiff a duty to exercise ordinary care in designing, manufacturing, marketing, testing, selling and distributing the automobiles in question; and to discover dangerous propensities of its product. Old GM and New GM failed to exercise ordinary care in designing, manufacturing, marketing, testing, selling and distributing the Subject Vehicle and the Defective Vehicles in question.

96.     Old GM and New GM designed, manufactured, and/or sold the Defective Vehicles, including the Subject Vehicle, with unreasonably dangerous design, manufacturing, and/or marketing defects, as set forth herein, within the meaning.

97.     Old GM and New GM breached their duties to Plaintiff by designing, manufacturing, marketing, testing, selling and distributing the Subject Vehicle with a latent dangerous defect in the Ignition Switch and/or by failing to warn of the defects and/or by failing to adopt a safer, practical, feasible or otherwise reasonable alternative design that could have then been reasonably adopted to prevent or substantially reduce the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Subject Vehicle.

98.     Plaintiff suffered serious injuries as a result of GM's breach of its duties to Plaintiff.

**C.     FRAUDULENT CONCEALMENT**

99.     Plaintiff hereby incorporates by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

100.     Old and New GM each concealed and suppressed material facts concerning the Subject Vehicle.

101.    As described above, Old GM and New GM each made material omissions and affirmative misrepresentations regarding the Subject Vehicle.

102.    Old GM and New GM each knew these representations were false when made.

103.    The Subject Vehicle was, in fact, defective, unsafe and unreliable, because the vehicle was subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision.

104.    Old GM and New GM had a duty to timely disclose these safety issues to Plaintiff, the public, and NHTSA, but failed to do so.

105.    Old GM and New GM each had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden unintended shutdown, with the attendant loss of power steering, power brakes, and the non-deployment of airbags in the event of a collision, because Plaintiff relied on Old and New GM's representations that the vehicle they were driving was safe and free from defects.

106.    The aforementioned concealment was material, because if it had been disclosed, Plaintiff would not have driven, rode in, or retained the Subject Vehicle.

107.    The aforementioned representations were also material because they were facts that would typically be relied on by a person driving or retaining the Subject Vehicle.  Old GM and New GM each knew or recklessly disregarded that their representations were false because they knew that people had died as the result of the vehicles' defective ignition switch systems. Old GM and New GM each intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

108.    Plaintiff relied on the Old GM and New GM reputation – along with their failure to disclose the ignition switch system problems and the Companies' affirmative assurances that

- 26 -

their vehicles were safe and reliable and other similar false statements – in driving, riding in, and retaining the Subject Vehicle.

109.    However, Old and New GM each concealed and suppressed material facts concerning the culture of Old and New GM – a culture that emphasized cost-cutting, avoidance of dealing with safety issues, and a shoddy design process.

110.    Further, Old and then New GM each had a duty to disclose the true facts about the Defective Vehicles because they were known and/or accessible only to Old and then New GM who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff.  As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Defective Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

## VII.  <u>DAMAGES</u>

111.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this complaint as if fully copied and set forth at length herein.

112.    Because Plaintiff's damages were directly and proximately caused by Defendants' conduct, Plaintiff is entitled to all reasonable and proper compensation allowed by law, including but not limited to:

    a.    past and future medical expenses and charges;

    b.    past and future physical pain and mental anguish;

    c.    past and future physical impairment;

    d.    past and future disfigurement.

113.    Plaintiff additionally seeks actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

- 27 -

1309683.1

## VIII.   PUNITIVE DAMAGES

114.    Plaintiff hereby incorporates by reference each and every paragraph set forth in this Complaint as if fully copied and set forth at length herein.

115.    Plaintiff would further show that the clear and convincing evidence in this case will show that New GM and Old GM consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicle and failing to recall the vehicle in a timely manner.  New GM and Old GM had actual, subjective awareness of the risk involved, but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiff.  Therefore, punitive damages are sought and should be assessed against Defendant.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against New GM and in favor of Plaintiff, and grant the following relief:

A.    Award Plaintiff actual, compensatory, and/or statutory damages, according to proof;

B.    Award Plaintiff punitive and exemplary damages in an amount sufficient to punish New GM for its misconduct and deter the repetition of such conduct by New GM or others;

C.    Award Plaintiff her reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

D.    Award Plaintiff such other and further relief as this Court may deem proper, just, and equitable.

Dated: June 29, 2016

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: _____
Annika K. Martin

Annika K. Martin (AM 2972)
akmartin@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:     (212) 355-9500
Facsimile:      (212) 355-9592

Elizabeth J. Cabraser
ecabraser@lchb.com
Todd A. Walburg
twalburg@lchb.com
Phong-Chau G. Nguyen
pgnguyen@lchb.com
Kevin R. Budner
kbudner@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

*Attorneys for Plaintiffs*

1309683.1

## JURY TRIAL DEMAND

Plaintiff hereby requests a trial by jury on all claims so triable.

Dated: June 29, 2016

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: _____
        Annika K. Martin

Annika K. Martin (AM 2972)
akmartin@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:     (212) 355-9500
Facsimile:      (212) 355-9592

Elizabeth J. Cabraser
ecabraser@lchb.com
Todd A. Walburg
twalburg@lchb.com
Phong-Chau G. Nguyen
pgnguyen@lchb.com
Kevin R. Budner
kbudner@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

*Attorneys for Plaintiffs*

1309683.1